## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-KA-01321-SCT

*JOEY MONTRELL CHANDLER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2005 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT B. McDUFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/07/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

**PROCEDURAL HISTORY**

¶1.     Joey Montrell Chandler (Chandler) was indicted for the murder of his cousin Emmitt

Chandler (Emmitt) pursuant to Miss. Code Ann. §  97-3-19.[1]  Chandler was tried for the

crime of murder by a jury in the Circuit Court of Clay County, Mississippi, the Honorable

James T. Kitchens, Jr., presiding.  Chandler was convicted of murder by the jury and

---

[1] In the record Emmitt Chandler's name is spelled as both Emmitt and Emmet.
This opinion will spell his name as Emmitt, unless it is spelled differently in a quoted
passage.

sentenced by the trial court to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. The trial court denied all of Chandler's post-trial motions. Chandler now appeals his conviction and sentence to this Court.

**FACTS**

¶2. Ben McCurry rode with Chandler to the store on August 17, 2003. During their ride, Chandler told McCurry that he had been "hit," meaning that some of Chandler's possessions had been stolen from him. According to McCurry, Chandler stated that Emmitt stole a pound of marijuana from him that was wrapped in his T-shirt and $400. Chandler suspected that Emmitt stole the items because Emmitt was the only person around Chandler's car when Chandler went inside the store to buy a drink.

¶3. When Chandler returned to his car, he saw that "his stuff had been fumbled with" and the white T-shirt was on the ground. Chandler told McCurry that he had to have the marijuana by Tuesday or else somebody was going to kill Chandler or his family. He also told McCurry that he had to "take care of business." McCurry explained that taking care of business meant that Chandler "had to get the money back or get the drugs back or do whatever." Within one and a half to two hours after leaving Chandler, McCurry heard that Emmitt had been shot and killed. McCurry stated that Chandler was scared when he talked to McCurry that day.

¶4. Robert Carouthers, Antoine Belt, Dana Gustavis, and Brandon Ewing were present when Emmitt was shot. Carouthers, Belt, and Gustavis testified at trial. Carouthers and Gustavis were scared by the shooting and initially told police that they did not witness the

2

crime. None of these witnesses's testimony corroborated Chandler's version of event. The individual testimony of Carouthers, Belt, and Gustavis are addressed under each issue.

¶5.     Chandler testified that on August 16, 2003, he had a quarter pound of marijuana in his car wrapped in a blue shirt. Chandler planned to sell the drugs to make some extra money since his girlfriend was pregnant. However, the marijuana was taken from his car at Club Hollywood on the night of August 16. As Chandler walked out of the club, he saw Emmitt exiting his car with the marijuana wrapped in the blue shirt. Emmitt then told Chandler that he heard that Chandler "got hit."

¶6.     The next day, Chandler stopped by his Uncle Troy's house and borrowed a gun. Chandler tucked the gun into his pants to protect himself because of "all the rumors that were surfing around."

¶7.     Later, Chandler met Emmitt at a store. According to Chandler, Emmitt wanted to show Chandler something that belonged to him in the Pheba community, however, Chandler was afraid to follow Emmitt. Nevertheless, Chandler followed Emmitt to Pheba.

¶8.     When they arrived in Pheba, Emmitt spoke to everyone about marijuana. Chandler testified that Emmitt asked him to go into the woods with him. Emmitt and Chandler walked into the woods. Carouthers, Belt, Gustavis, and Ewing followed them into the woods.

¶9.     Chandler said that he and Emmit were surrounded by the other people that were present. Emmitt was brushing up next to Chandler and told Chandler "you're a punk." However, Chandler testified that Emmitt grabbed his gun from his pants. Chandler stated that he was scared, so he grabbed for the gun. At this point, Chandler and Emmitt began to struggle for the gun Chandler described the struggle as follows:

3

The gun went off during the struggle, and during the struggle, Emmitt held the gun and he was trying to turn the gun and it kept going off. I noticed at one point in time he was hit, and as he was hit, he held on to the gun and pulled me to the ground with him and the gun steadily went off.

¶10. Chandler, initially, fled the scene in his car, however, he returned to Emmitt, asked him if he was "okay," and told Emmitt that he would get him some help. Chandler later had a family member drive him to the sheriff's office that night.

¶11. On cross-examination, Chandler gave his two versions of the shooting. Chandler admitted that on the night of the shooting he spoke to Joe Huffman, the investigator for violent crimes for the Clay County Sheriff's Department. Chandler told Huffman that he pulled out the gun, aimed it, and pulled the trigger. However, Chandler, also, denied intentionally firing the gun. Instead, he implied that the gun may have accidently misfired during his struggle with Emmitt.

¶12. Troy Chandler, Chandler's uncle, testified that he never gave Chandler permission to "borrow" his .357 Magnum pistol. After a police search on a pond near his property, Troy identified a recovered pistol as his .357 Magnum pistol.

¶13. Dr. Steven Hayne, forensic pathologist for the State of Mississippi, performed the autopsy on Emmitt's body. Dr. Hayne identified two gunshot wounds. One of the wounds was a gunshot to Emmitt's right arm below his shoulder. This gunshot exited the arm and re-entered the body on the right side of Emmitt's chest. A second gunshot struck Emmitt in the right chest wall. Dr. Hayne determined that these two gunshot wounds penetrated the body cavity, causing lethal wounds. Other than an abrasion to Emmitt's ankle, there was no evidence of defensive or offensive injuries.

4

¶14. Based on his observations, Dr. Hayne concluded that the gunshots wounds that Emmitt received were not from a contact wound, but from a near contact or distant gunshot wound. Dr. Hayne testified that either of the gunshot wounds would have resulted in Emmitt's death. In Dr. Haynes's opinion, Emmitt's death was a homicide caused by acute internal ensanguination or blood loss.

## ISSUES

I. **Whether the trial court erred by denying a jury instruction for culpable negligence manslaughter.**

II. **Whether the trial court erred by denying a jury instruction for reasonable self-defense.**

III. **Whether the trial court erred by excluding evidence supporting a claim of self-defense.**

## ANALYSIS

### I. Culpable negligence instruction

¶15. Chandler argues that the trial court erred by denying his requested instruction on culpable negligence manslaughter. The indictment against Chandler stated the following:

JOEY CHANDLER

late of the County aforesaid, did on or about the 17th day of August, 2003, in the County aforesaid, **unlawfully, wilfully, and feloniously, with the deliberate design to effect death, kill and murder a human being, Emmitt Chandler**, without authority of law **and not in necessary self defense**, in violation of MCA § 97-3-19; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Mississippi;

(emphasis added). The trial court granted jury instructions for deliberate design murder, S-3; depraved heart murder, S-3; imperfect or unreasonable self-defense, S-4; and accident and

5

misfortune, D-8. The trial court refused to give culpable negligence manslaughter instructions, D-11 and D-14, and reasonable self-defense instructions, D-12 and D-15.

¶16. Chandler contends that the trial court erred by denying an intermediate unintentional death instruction for culpable negligence manslaughter since it is a lesser included offence of depraved heart murder. To demonstrate that culpable negligence is a lesser included offense of depraved heart murder, Chandler relies upon *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992), for the proposition that depraved heart murder and culpable negligence manslaughter are distinguished only "by the degree of the mental state of culpability."

¶17. Chandler also cites to new legislation added in 2004. In 2004, the Legislature added subsection (2) to Miss. Code Ann. § 99-7-37 which provides:

> An indictment for murder or capital murder shall be sufficient to also charge the lesser offense of manslaughter without a specific allegation of such lesser crime and without any necessity for an additional count charging such lesser crime.

Miss. Code Ann. § 97-7-37(2). The Legislature also added subsection (3) to Miss. Code Ann. § 97-3-19:

> An indictment for murder or capital murder shall serve as notice to the defendant that the indictment may include and all lesser included offenses thereof, including, but not limited to manslaughter.

Miss. Code Ann. § 97-3-19(3).

¶18. The trial court allowed jury instruction S-4, a manslaughter instruction for unreasonable self-defense, which allowed the jury to find Chandler guilty of manslaughter if the State failed to prove all the elements of murder.

6

¶19. The trial court considered counsels' arguments for proposed instruction D-14, a culpable negligence manslaughter instruction, as follows:

By the Court:        What says the State to D-14?

[State]:             I would object to D-14 on two bases, your Honor. The first one is that there is no evidence whatsoever again, and I keep coming back to it, before the jury that this was an intentional killing committed through a negligent act. This was one of two things. It was either a gun was pointed, aimed, and shot, or it was a gun that just went off during a struggle. There's no basis in the evidence for a culpable negligence instruction. My second objection to it is it is not a complete definition of culpable negligence. If the Court is inclined to give a culpable negligence instruction, I have one that I would like to submit in its place.

By the Court:        Let me hear Mr. Cliett on this. How is it culpable negligence manslaughter?

[Defense]:           Well, your Honor, first of all, the reason that we prepared this instruction and submitted it is because the State's elements instruction had an either/or there and we prepared this. Now, your Honor, I think there was some testimony from two eyewitnesses that they saw my client pull out a gun and they turned and were walking away.

By the Court:        Right.

[Defense]:           Well, you Honor, if he was pulling a gun out or he was spinning it around, then the jury may find that that was negligent and it went off for whatever reason or however, and that's why we submitted this instruction.

By the Court:        All right. D-14 will be refused.

¶20. The following exchange occurred for the proposed manslaughter jury instruction D-11.

By the Court:        What says the State to D-11?

7

| | |
|---|---|
| [State]: | Your Honor, I would object to D-11. There is simply no basis in the evidence for this instruction. There is no bases whatsoever that this was an intentional killing without malice. The evidence is that it was either a) an intentional, willful firing of the gun by the defendant; or b) it was the gun just went off. There is no basis in the evidence whatsoever for this instruction, and I would object. |
| [Defense]: | Your Honor, this is verbatim 97-3-35 elements of manslaughter, homicide, killing without malice - - maybe it's not. Wait a minute. That's the heat of passion, your Honor. I'm sorry. |
| By the Court: | The problem is the Supreme Court has still said the use of a deadly weapon does support the jury's finding of malice, and I know there's this statute. My inclination is to look more, quite frankly, towards the imperfect self-defense instructions rather than this D-11. I'm going to refuse D-11. |

¶21. This Court set forth the standard of review for the grant or denial of jury instructions in *Ladnier v. State*, 878 So. 2d 926, 931 (Miss. 2004):

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Ladnier*, 878 So. 2d at 931. *See also Wilson v. State*, 904 So. 2d 987, 992 (Miss. 2004); *Fairley v. State*, 871 So. 2d 1282, 1285 (Miss. 2003). In *Sanders v. State*, 781 So. 2d 114, 119 (Miss. 2001), this Court affirmed a trial court's refusal to grant a culpable negligence instruction based on a lack of evidence to support the instruction. This Court held:

> Lesser included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant

guilty of the lesser offense and to acquit him of the greater offense. *Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990). In reviewing the propriety of such an instruction, we have stated:

> A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser-included offense (conversely, not guilty of at least one element of the principal charge).

*McGowan v. State*, 541 So. 2d 1027, 1028 (Miss. 1989). However, this Court has repeatedly held that a lesser-included offense instruction should not be indiscriminately granted, but rather **should be submitted to the jury only where there is an evidentiary basis in the record.** *Lee v. State*, 469 So. 2d 1225, 1230 (Miss. 1985).

*Sanders*, 781 So. 2d at 119 (emphasis added); *see also Fairley*, 871 So. 2d at 1285.

¶22. Miss. Code Ann. § 97-3-47 concerns culpable negligence and provides:

> Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.

"Thus, culpable negligence is defined as 'the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the wilful creation of an unreasonable risk thereof.'" *Evans v. State*, 562 So. 2d 91, 94 (Miss. 1990) (citing *Smith v. State*, 197 Miss. 802, 20 So. 2d 701, 701 (1945)). This Court more recently defined manslaughter by culpable negligence as "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Shumpert v. State*, 935 So. 2d 962, 967 (Miss. 2006) (citing *Evans v. State*,

9

562 So.2d 91, 95 (Miss. 1990)). *See also Fairley*, 871 So. 2d at 1285 (culpable negligence manslaughter instruction denied where evidence showed that defendant argued, pointed a gun at the victim and shot her, and then pushed her onto the road where she was hit by a passing vehicle); *Sanders*, 781 So. 2d at 119 (culpable negligence manslaughter instruction denied where evidence showed that defendant intentionally hit victim in the head with a hammer); *Clark v. State*, 693 So. 2d 927, 932 (Miss. 1997) (culpable negligence manslaughter instruction denied where evidence showed that defendant intentionally went to his truck to get his shotgun, then entered the building, shot the door and loaded and fired three more shots through the door); *Hurns v. State*, 616 So. 2d 313, 315 (Miss. 1993) (culpable negligence manslaughter instruction denied where evidence showed that defendant hit victim with multiple blows to the head with blunt object over short period of time); *Goff v. State,* 778 So. 2d 779 (Miss. Ct. App. 2000) (culpable negligence manslaughter instruction denied where evidence showed that defendant intentionally hit and kicked victim two times).

¶23. After examining the record on appeal and jury instructions D-14 and D-11, we conclude that these instructions were not supported by the evidence and were, therefore, improper. *See Ladnier*, 878 So. 2d at 931 ("A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which . . . is without foundation in the evidence").

¶24. We find that the facts and testimony presented do not support the grant of a culpable negligence manslaughter instruction. Chandler admitted that on the night of the Emmitt's death, he told Huffman, an investigator for the Clay County Sheriff's Department, that "I pulled the gun out and aimed it and shot. Pulled the trigger."

10

¶25.    At trial, Chandler testified to a different version of events. Chandler refused to admit that he pulled the trigger of the gun and stated that during a struggle between Emmitt and himself, the gun "started to go off." In addition, Chandler stated that he needed to protect himself the day Emmitt was killed because of "all the rumors that were surfing around." He, therefore, "borrowed" a .357 Magnum gun from his uncle's car. Chandler carried the gun in his pants. Despite being afraid of Emmitt, Chandler nonetheless agreed to follow Emmitt in his own separate car to the Pheba community. Chandler voluntarily followed Emmitt into the woods. Once in the woods, Chandler stated that Emmitt threatened to kill him. However, Chandler never saw Emmitt with any weapon. Chandler claimed that Emmitt pulled the gun from his pants and a struggle ensued between them. Chandler stated that Emmitt tried to turn the gun on him and the gun fired during the struggle.

¶26.    Three of the four witnesses present in the woods at the time Emmitt was shot testified at trial. None of these witnesses confirmed Chandler's testimony. Specifically, none of the witnesses stated that there were any arguments or that Chandler and Emmit struggled. In fact, all witnesses stated that Chandler and Emmitt were facing each other in the woods. Carouthers and Belt stated that Chandler and Emmitt were having a conversation. Belt stated that the conversation was normal with no arguing or loud talking. Carouther saw Chandler pull a gun out and point it toward Emmitt. Belt saw Chandler pull a gun out, and Chandler rubbed the side of Chandler's head with it. Belt turned to follow Carouthers out of the woods. As they were turning to leave both Carouthers and Belt testified that they heard gunshots and fled the woods. Belt stated that he heard three gunshots.

11

¶27. Gustavis stated that while in the woods, he saw Chandler pull out a gun and rub the side of Chandler's head. As he and Ewing were turning to leave the woods, Chandler told them to "come back." When Gustavis turned around he saw Chandler cock the gun and shoot it. Gustavis then ran from the woods.

¶28. Chandler deliberately carried a gun in his pants on the day of Emmitt's death. Chandler followed Emmitt to Pheba in his own car despite being allegedly scared of "rumors." Chandler deliberately brought the gun into the woods. The gun was fired three times. Since the gun was a revolver, the gun's trigger actually had to be pulled three times. Two of the shots hit Emmitt causing his death. The facts do not support a culpable negligence manslaughter instruction.

¶29. In addition, the trial court was more than fair in the instructions given to the jury. Jury instruction S-4 was an imperfect self-defense manslaughter instruction given to the jury. This instruction adequately informed the jury of the lesser included offense of manslaughter. Jury instruction S-4 provided:

> The Court instructs the Jury that if you unanimously find that the State has failed to prove all the elements of the crime of Murder, you may then proceed in your deliberations to consider the lesser charge of Manslaughter. However, it is your duty to accept the law given to you by the Court; and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to make such finding, and not be influenced by your power to find a lesser offense. This provision is not designed to relieve your from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.
>
> The Court instructs the Jury that if a person kills another under the actual bona fide, belief that such a killing is necessary in order to protect himself from great bodily harm or death, but that such belief is not reasonable

12

under the circumstances, then there is no malice aforethought and the killing is not murder, but at most is the crime of manslaughter.

Therefore, if you find from the evidence in this case that on August 17, 2003, the Defendant, Joey Chandler, did shoot and take the life of Emmett Chandler, acting on his actual and bona fide belief that such was necessary to protect himself from great bodily harm or death at the hands of Emmett Chandler, but that such belief by the Defendant was not a reasonable belief under the circumstance, then you may find the Defendant guilty of the lesser included offense of manslaughter.

Accordingly, we find that this issue is without merit.

**II. Reasonable self-defense instruction**

¶30. Chandler argues that the trial court erred by refusing jury instructions D-12 and D-15, concerning reasonable self-defense. Chandler argues that his reasonable self-defense instruction would have allowed for an acquittal. Chandler contends that the trial court effectively granted a directed verdict again him by denying the reasonable self-defense instruction. Chandler maintains that the jury could have concluded that any self-defense was reasonable because he was in fear and was attacked by Emmitt.

¶31. In *Johnson v. State*, 908 So. 2d 758 (Miss. 2005), this Court set forth the standard of review for jury instructions. This Court held:

> In reviewing a challenge to jury instructions, the instructions actually given must be read as a whole. *Williams v. State*, 863 So. 2d 63, 65 (Miss. 2004). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. *Id*.

*Johnson*, 908 So. 2d at 764; *see also* *Ladnier*, 878 So. 2d at 931.

¶32. However, this Court has held that "[i]f a person provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary, he

13

becomes the aggressor, and deprives himself of the right of self-defense." ***Parker v. State***, 401 So. 2d 1282, 1286 (Miss. 1981).

¶33.    We find that the evidence did not support a reasonable self-defense instruction. First and foremost, Chandler never testified that his actions were in self-defense. The facts show that Chandler deliberately armed himself on the day of the shooting. Chandler put a .357 Magnum gun in his pants on the day of Emmitt's death. Therefore, Chandler was the aggressor in this case.

¶34.    Chandler first told a sheriff's' investigator that he pulled out a gun, pulled the trigger and shot Emmitt. Later at trial, Chandler changed his version of events and testified that the gun "went off" but refused to admit that he ever pulled the trigger. Three witnesses, Carouthers, Belt, and Gustavis, testified that Emmitt and Chandler were facing one another, and Chandler pulled out a gun. Two witnesses turned away and within seconds heard gunshots.

¶35.    One witness stated that he saw Chandler point and shoot the gun at Emmitt. None of the witnesses testified to any argument between Chandler and Emmitt. None of the witnesses saw Emmitt with a gun. None of the witnesses stated that Chandler or Emmitt were arguing. All of the witnesses stated that Chandler and Emmitt were standing facing each other. None of the witnesses saw Emmitt acting in an aggressive way or making threats to Chandler. No witness saw Emmitt and Chandler struggle over the gun. Carouthers and Belt described the gunshots as being fired very close together.

¶36.    Chandler testified that he borrowed a gun from his uncle on August 17, 2003. The gun was placed in the front of his pants. Despite being allegedly frightened of Emmitt,

14

Chandler walked into the woods with Emmitt. According to Chandler, Emmitt grabbed his gun. However, during the struggle, Chandler had the handle of the gun and Emmitt had the barrel. As Emmitt tried to turn the gun, the gun fired. Chandler stated the gun fired three times. He also stated that the bullets were fired "immediately after each other." However, the revolver's trigger had to have been pulled three times. Further, according to Dr. Hayne, Emmitt was shot twice in the chest from a distance.

¶37. Clearly, Chandler's actions were not reasonable. Chandler armed himself before he met with his cousin, Emmitt. Chandler, who was allegedly in fear of Emmitt, agreed to to follow Emmitt to Pheba and then voluntarily followed Emmitt into the woods, carrying a gun. Some of the witnesses testified that Chandler loaded the gun in front of them. Initially, Chandler told a Clay County investigator that he pulled the trigger and shot Emmitt. Chandler's version of events changed at trial where he implied that the gun may have accidentally misfired, but Chandler never testified that he acted in self-defense.

¶38. What is more, the jury received an imperfect self-defense jury instruction, S-4, which is quoted in its entirety in Issue I and will not be reiterated here. In addition, the jury received an accident or misfortune instruction, D-8. Jury instruction D-8 provided:

> The Court instructs the jury that if you find from the evidence that Joey Chandler killed Emmitt Chandler by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation then you shall find the Defendant Not Guilty.

We find, again, the trial court more than adequately instructed the jury. This issue is without merit.

### III. Exclusion of evidence supporting a claim of self-defense

¶39. Chandler argues that the trial court erred by excluding certain statements as hearsay. Chandler testified that he was afraid on August 17, 2003, because of rumors that he had heard. However, the trial court refused to allow Chandler to state exactly what he had been told that made him fearful. This occurred on two occasions. On the first occasion, Chandler was not allowed to testify that on August 17, 2003, McCurry told Chandler that Emmitt was out to get him. In addition, Chandler was not allowed to testify that on the same day Ewing told Chandler a specific rumor.

¶40. M.R.E. 801(c) provides:

> "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

¶41. In *Shaw v. State*, 915 So. 2d 442, 445 (Miss. 2005), this Court set forth the standard of review for admissibility of evidence as follows:

> Our standard of review for the admission or exclusion of evidence is very familiar. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Jefferson v. State*, 818 So. 2d 1099, 1104 (Miss. 2002) (quoting *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996)). *See also Hill v. State*, 774 So. 2d 441, 444 (Miss. 2000); *Crawford v. State*, 754 So. 2d 1211, 1215 (Miss. 2000); *Gilley v. State*, 748 So. 2d 123, 126 (Miss. 1999); *Hughes v. State*, 735 So. 2d 238, 269 (Miss. 1999).

¶42. Chandler testified that after church on August 17, 2003, he borrowed his uncle's gun from his car. He felt that he needed to protect himself because of "all the rumors that were surfing around." Later that day, when Emmitt told Chandler to follow him to Pheba so that Chandler could get something that belonged to him, Chandler testified that he was afraid to follow Emmitt because he heard a lot of rumors that day. On the drive to Pheba, Emmitt

16

pulled off the road and took something out of a ditch. Chandler again stated that he did not feel safe because of all the rumors, therefore, Chandler refused Emmitt's request to drive in front of Emmitt.

¶43. When they arrived in Pheba, Emmitt and Chandler went into the woods to allegedly retrieve some stolen car parts belonging to Chandler. Ewing, Gustavis, Carouthers and Belt followed Emmitt and Chandler into the woods. According to Chandler, when everyone arrived in a clearing in the woods, they began to argue about the location of the drugs. Chandler stated that Emmitt said that everyone else present were "going to get" Chandler, whereas all the other witnesses present said that Emmitt wanted to get Chandler.

¶44. Chandler testified that he felt frightened when he and Emmit were surrounded by the other people. Emmitt was brushing up next to Chandler and told Chandler "you're a punk and my shotgun - - anybody come near you, I will kill them, and my shot gun do this and that." Chandler never saw a shot gun, however, Emmitt grabbed Chandler's gun from his pants. Chandler stated that he was scared, he did not know what Emmitt was thinking, and he did not want anyone to get hurt, so he grabbed for the gun too. Chandler thought that Emmitt's words were frightening, and he thought that Emmitt was trying to turn the gun on him and kill him. At this point, Chandler and Emmitt began to struggle for the gun. Chandler had the handle of the gun, and Emmit tried to turn the end of the gun when the gun fired. Chandler stated that at one point Emmitt tried to turn the gun toward Chandler. Chandler then fled the scene in his car. Chandler later told Investigator Huffman that he was scared because Emmitt kept talking about his shotgun and that Emmitt was going to go home to get his shotgun.

¶45. Clearly, Chandler testified on numerous occasions that he had heard "rumors." That because of the "rumors" he did not feel safe, and therefore, he borrowed his uncle's gun to protect himself. He also testified that at numerous times during the day he was afraid of Emmitt and afraid of what Emmitt might do. Chandler also stated that he was afraid of the other men present in the woods. He also stated that Emmitt stated that the other men were out to get Chandler, whereas the other men stated that Emmitt was out to get Chandler. Therefore, Chandler was able to get this information before the jury.

¶46. Even though this Court finds that Chandler had the opportunity to place his facts before the jury, the two statements by McCurry and Ewing will be analyzed.

### A. McCurry Statement

¶47. Chandler testified on direct examination that when he went to Club Hollywood to look for his shirt, he saw McCurry on August 17, 2003. McCurry told Chandler that he wanted to talk to him. Chandler stated "Well, at that point [McCurry] walked over to me. He spoke with me. He told me that he heard I had - - [.]" The prosecution objected on the basis of hearsay. The trial judge sustained the objection.

¶48. Chandler argues that the statement was not hearsay because the statement was not being offered for the truth of the matter asserted, that being "that Emmitt was going to get [Chandler]." Instead, Chandler claims that McCurry's statement was being offered "to show the jury that Chandler had reason to believe that Emmitt was out to hurt or kill him." We find that Chandler's reason to admit that Emmitt was going to get him, as stated in his brief, was in fact being offered for the truth of the matter asserted. Therefore, the statement was hearsay and properly excluded.

18

¶49. Accordingly, we find that the trial court did not err by excluding the testimony based on hearsay. Alternatively, assuming arguendo that any error occurred, the error is clearly harmless as Chandler placed before the jury that he was afraid for his life based on "rumors" he had heard. The jury also was made aware that Chandler believed Emmitt had stolen his marijuana.

### B. Ewing statement

¶50. Chandler also argues that the trial court erred by prohibiting Chandler from testifying about a statement made by Ewing to him. The trial court denied the statement on the basis of hearsay. Chandler argues that the trial court sustained the prosecution's objection on the basis of hearsay without any determination of whether the statement was offered for the truth of the matter asserted. Further, Chandler asserts that the statement was not hearsay because the statement concerned why he had reason to be afraid and why he went to get a gun.

¶51. The record reflects the following exchange:

| | |
|---|---|
| [Defense:] | At your Uncle Troy's house, what did you do? |
| A. | Uh, we will have to go back. At the church, Brandon Ewing had told me that somebody was going to - - |
| [Defense:] | - - Without saying what - - |
| [State:] | - -Objection to hearsay, your Honor. |
| By the Court: | Sustained. |
| [Defense:] | Without saying what anybody said, what did you do when you went to your Uncle Troy's house? |
| A. | I borrowed his gun out of his car. |
| [Defense:] | Why? |
| A. | Because I felt like I needed to protect myself with all rumors [sic] that were surfing around. |

¶52. We find that Chandler did not preserve this issue for appeal. Chandler made no argument before the trial court, and thus, he is procedurally barred on appeal. This Court

19

has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." ***Walker v. State,*** 671 So.2d 581, 597 (Miss. 1995) (citing ***Foster v. State,*** 639 So.2d 1263, 1270 (Miss. 1994)).

¶53.	Regardless of the trial court's ruling on the inadmissibility of Ewing's alleged statements, the jury heard Chandler testify that he heard "rumors." Because of the rumors, he felt scared and borrowed his uncle's gun to protect himself. Chandler testified that he was afraid of Emmitt. Again, while this testimony may not have been heard exactly to Chandler's liking, the testimony was nonetheless presented to the jury. We find that Chandler did not preserve the issue of Ewing's statements for appeal purposes and is procedurally barred.

## CONCLUSION

¶54.	For the foregoing reasons, this Court affirms the judgment of the Clay County Circuit Court.

¶55.	**CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**